## STATE ex rel. GLORIOSO v. BOARD OF SUPERVISORS OF ELECTIONS FOR PARISH OF JEFFERSON.

### No. 17509.

Court of Appeal of Louisiana. Orleans.

Dec. 2, 1940.

Rehearing Denied Jan. 13, 1941.

Fred A. Middleton, of New Orleans, and Leo W. McCune, of Gretna, for relator Mrs. Glorioso.

John E. Fleury, Dist. Atty., and Ernest M. Conzelmann, Asst. Dist. Atty., both of Gretna, for Board of Supervisors of Elections for Parish of Jefferson.

Samuel J. Tennant, Jr., of New Orleans, for Charles Spahr, member of Board of Supervisors of Elections for Parish of Jefferson.

JANVIER, Judge.

Mrs. Mabel Glorioso seeks, in this mandamus proceeding, to compel respondents, Eugene Riviere, Harvey Redmon and Charles Spahr, constituting the Board of Supervisors of Elections for the Parish of Jefferson, to meet and to declare that at the general election held on the 5th day of November, 1940, she was duly elected a member of the school board to represent the Seventh Ward of the said parish. She alleges that at the said general election there was to be elected a successor to Edward Comiskey, whose term as member of the said school board as representative of the Seventh Ward of the parish was about to expire; that at the primary election which had been held, the said Edward Comiskey had been selected as the Democratic nominee and that his name had been printed on the general election ballots as such party nominee and that no other party candidate, or independent candidate for said office, had qualified, and that, therefore, no other name than that of Comiskey had appeared on the general election ballot as a candidate for said office; that the said Comiskey, Democratic nominee and the only person whose name appeared on the said official ballot as a candidate for that office, died at about 4 o'clock on the afternoon of the day preceding the said general election, to-wit, on November 4, 1940. Mrs. Glorioso especially alleges that at the general election "more than one hundred voters wrote in the column provided for such purposes upon the official ballot the name of your relator". She also especially alleges that no person other than herself and the said deceased Comiskey received any votes for the said office and that, therefore, she, relatrix, "received all of the legal votes cast at said election". She does not allege that, at any time prior to the election, she filed with the clerk of the District Court of the Parish of Jefferson a statement containing her correct name and setting forth her consent and willingness to be voted for for the said office.

Respondents, by exception of no cause of action and of no right of action, and also in their answer—all of which pleadings were filed on the same day—point to the failure of Mrs. Glorioso to allege that she had filed with the Clerk of Court the notice referred to, and they maintain that no person may claim to have been elected to any such office unless his or her name appeared printed on the official ballot, or unless such notice was given to the proper clerk of court, or clerks of court if the district involved contains more than one parish.

This contention, on which hinges the entire controversy, is based on section 15 of Article VIII of the Constitution of Louisiana of 1921, as amended by Act No. 80 of 1934, and upon section 73 of Act No. 224 of 1940, both of which are concerned with the "writing in" on official ballots of names of persons who have not qualified to have their names officially printed on such ballots. The referred-to constitutional amendment of 1934 and the act of 1940 are identical in meaning, though not in terms; the said constitutional amendment providing that "no person whose name is not authorized to be printed on the official ballot, as the nominee of a political party or as an independent candidate, shall be considered a candidate for any office unless he shall have filed with the Clerks of the District Court of the parish or parishes in which such election is to be held, or the Clerk of the Civil District Court of the Parish of Orleans if he be a resident of the Parish of Orleans, at least ten (10) days before the general election, a statement containing the correct name under which he is to be voted for and containing the further statement that he is willing and consents to be voted for for that office, and provided further that no commissioners of election shall count a ballot as cast for any person whose name is not printed on the ballot or who does not become a candidate in the foregoing manner". As we have said, the Act of 1940 contains language almost identical.

It is conceded that no such notice was filed by Mrs. Glorioso, but her contention is that none was necessary since she was not a candidate in the sense that she sought the office or solicited votes. She maintains that the prohibition against the counting of votes for a person whose name is not printed on the ballot and who gives no such notice operates only against the counting of ballots for one who actively seeks the said office and not against one who, not soliciting political support, is spontaneously voted for by friends. She also maintains that the legal prohibition against the counting of such votes was not intended by the framers of the statutes, nor by the voters who approved the constitutional amendment, to have application in such

a situation as this, where there is no legal candidate whose name is printed on the ballots.

Mrs. Glorioso also contends that, in any event, the Board of Supervisors of Elections is without authority to do anything other than certify her as having been duly elected since, as she contends, that Board has no discretion, but must certify as duly elected such person who, whether legally or not, is shown by the returns or tabulations of the Commissioners of Election to have received a majority of the votes legally cast.

She also contends that the right of voters to "write in" the names of candidates is given to them by the Constitution and that, therefore, this right cannot be denied them merely for the reason that the person for whom such "write in" ballots may have been cast has not notified the clerk of court of willingness to accept.

In the court below there was judgment for Mrs. Glorioso, ordering the Board of Supervisors of Elections to meet and to declare that she has been duly elected as a member of the School Board for the Parish of Jefferson to represent the Seventh Ward. Respondents have appealed.

Since there are no facts in controversy —the entire matter depending upon whether, in absence of notice by Mrs. Glorioso, any votes for her could be counted—we have decided to decide the case on the merits rather than on the exception.

■ The first contention—that Mrs. Glorioso did not seek the office and therefore was not a candidate—does not impress us. It would not do to permit anyone to defeat the purpose of the statute and the purpose of the amendment, whatever that purpose may have been, by merely remaining inactive and permitting friends to solicit the necessary votes. Besides, a candidate is not necessarily a person who actively campaigns for office. The word "candidate" is defined, in Webster's New International Dictionary, Second Edition, as "one who offers himself, or is put forward by others, * * *".

■ Then, too, the contention that Mrs. Glorioso was not a candidate is inconsistent with one of the contentions set forth above —that voters have the right to "write in" the names of candidates. Since it is contended that the voters had the right, under this provision, to "write in" the name of Mrs. Glorioso, it is inconsistent for her to now make the contention that she can claim the benefit of that provision and yet contend that she was not a candidate.

■ The second contention, that the legal provisions against the counting of votes for any "write in" candidate who may not have given such notice have no application where the only properly qualified candidate has died, has no merit at all. Even assuming, for the moment, that courts are authorized to substitute for clearly expressed legal enactments their own views of what the legislators may have intended, it would not produce a democratic result to permit the accomplishment of what relatrix attempts here. Assuming that her allegations are well founded and that she received more than 100 votes and that no person other than Comiskey received any votes, this does not necessarily mean that she is the choice of the majority of the voters of the district. It merely shows that her friends were a little more prompt than were others to realize the political possibilities of the situation and to organize in her behalf. While the record does not show the total number of persons who voted in the district, it does appear that many times the number of votes which Mrs. Glorioso claims to have received were cast for the dead former candidate, Comiskey, and, had the voters had sufficient time to consider the situation and had they had the opportunity to vote for others, it is possible that a majority may have voted for some person other than Mrs. Glorioso. Of course, it is true that she, in a legal election, might herself have been overwhelmingly elected, but the mere fact that she received some votes under the circumstances shown does not in itself indicate that she was the choice of the majority.

■ The next contention is that the Board of Supervisors of Elections has no discretion in the matter and, having been advised of the death of Comiskey and that Mrs. Glorioso received some votes and that no one else received any, must declare her to have been duly elected. The contention is founded on the theory that, however illegal the commissioners of election may act, the Board of Supervisors of Elections may only perform their ministerial duties and must promulgate the results of these acts, whether illegal or not.

Even if this were true, the result desired by Mrs. Glorioso could not be accomplished here for the reason that the

record shows rather plainly that no votes were officially tabulated in either precinct for Mrs. Glorioso. There were two precincts in the district—Precinct 1 and Precinct 2—and the commissioners of election of Precinct 1, in making their returns, did not officially count any votes for Mrs. Glorioso, but simply advised the Supervisors of Elections that in that box there had been found thirty-six ballots on which Mrs. Glorioso's name had been written, but they specially added that these votes had not been counted—in other words, had not been officially counted and had not been tabulated. So that we do not see that the Supervisors of Election had any official returns before them which would have justified their declaring Mrs. Glorioso to have been elected, even assuming that they had no right to inquire into the legality or illegality of the action of the commissioners of election.

■ Counsel contend that the Board of Supervisors of Election were justified in disregarding the votes for Comiskey, for they knew that he was dead, but that they were not justified in disregarding the votes for Mrs. Glorioso because it would require evidence to show that she had not legally qualified, and the said Supervisors of Election had no authority to inquire into such questions of fact.

If commissioners have no right at all to inquire into facts and must certify as duly elected the person whose name is shown on the tabulation to have received a majority of the votes cast, then they should have certified Mr. Comiskey. If they could not inquire into the fact that Mrs. Glorioso could not be a candidate because she had given no notice, no more could they inquire into the fact that Mr. Comiskey could not be a candidate because he had died.

As we have stated, the record shows that, in the second precinct, the commissioners made no return whatever showing votes for Mrs. Glorioso, whereas in the first precinct—that on which she now relies—the commissioners in their return showed that in the box there were found certain ballots on which her name had been written, but, as we have said, they were careful to state that these votes had not been "counted". Their statement of the number of these votes was merely to inform the Supervisors of Elections and was not given as an official tally. The

fact was mentioned merely as a memorandum.

Let us consider for a moment the result which might be accomplished should Mrs. Glorioso be upheld in her contention that she should be declared to have been duly elected. So far as we know, in the second precinct the name of some other person may have been written in on more ballots than the thirty-six which Mrs. Glorioso claims to have received in Precinct 1. The commissioners in the second precinct —familiar with the law and knowing their duties—made no mention of any such ballots, or of any ballots for Mrs. Glorioso. Assuming for the moment that such a thing did occur and that some other person received more "write in" ballots in the second precinct than Mrs. Glorioso claims to have received in the first precinct, the legal action of the commissioners in the second precinct would have prevented that other person from being elected and the illegal action of the commissioners of the first precinct would have resulted in the election of Mrs. Glorioso. Such a result surely cannot be countenanced.

■ The last contention of relator— that the Constitution gives the right to any voter to "write in" the name of any candidate and that this right cannot be taken away—falls of its own weight when we find that it is the Constitution itself which declares that the right to "write in" the name of a candidate may be exercised only in favor of one who has given the notice so often referred to above.

In oral argument counsel for Mrs. Glorioso suggest that, should we conclude that she is not entitled to the relief prayed for, we should hold the election to have been a complete nullity insofar as it involved the office with which this case is concerned, and they assert that, if the election was not null, then there is no legal authority for the holding of another election and that the Governor of the State will be authorized to appoint, for the full term, the representative of the Seventh Ward on the School Board of the Parish of Jefferson. They state that since section 17 of Act No. 100 of 1922 and Article VIII, section 10 of the Constitution of 1921, as amended by Act No. 331 of 1936, require that the said office be filled at a congressional election, if such election is declared a nullity a new election must be called, whereas if it be held that there was

an election but that no one was elected, then the present vacancy may be filled by appointment of the chief executive.

Be that as it may, we do not find that question to be before us. On the contrary, Mrs. Glorioso not only maintains that a valid election was held, but also that she was legally elected at that election. The only question before us is that involving her own election, vel non, and we hold only that she has not been so elected. See Dumestre v. Fisher, La.App., 195 So. 25. Whether such a result will make it necessary that another election be called is not at this time within our province to determine.

The respondents are well within their rights in declining to be compelled by mandamus to do something which the law neither authorizes nor requires them to do.

On submission of this case counsel for respondents called upon us to render our decree within twenty-four hours on the theory that there is involved an "election contest" and that in all appeals where such election contests are involved the laws of the state, require that a decree be rendered within "twenty-four hours after submission". Act No. 46 of 1940, § 86.

We have not complied with this request and think it proper that we should set forth our reasons.

In the first place, we do not view the case as one involving an "election contest", and, in the second place, while, in our primary election laws, there is a requirement that appeals in cases involving election contests shall be decided within "twenty-four hours after submission", there is no similar requirement in our general election laws.

An "election contest" is generally recognized as one between rival candidates or contestants and the term is not usually applied to a mandamus proceeding in which there is no controversy between rival aspirants, but where there is involved the attempt of one candidate to force some official or some board to perform a ministerial duty. The difference between such a mandamus proceeding and an "election contest" was recognized by the Supreme Court in State ex rel. Elston et al. v. Parish Democratic Executive Committee for the Parish of Plaquemines et al., 173 La. 844, 138 So. 857, 859, wherein the court said:

"The present suit is not a contest of a primary election, at which a candidate claims to have been nominated. Nor is it a contest made against the qualifications of any other candidate within the meaning of section 11 of the act. [Act 97 of 1922].

"But this is a mandamus proceeding to compel defendants to perform their ministerial duties under the law and, aside from the summary manner of trial, is governed by the same rules of procedure as in ordinary cases.

"The provision, therefore, in section 27 of Act 97 of 1922, the Primary Election Law, that 'no contest shall be entertained unless brought within two days after the official promulgation of the result of the election,' has no application to the present case.

"For the same reason, it was not incumbent upon relators to appeal the case 'within not more than five days from the rendition of the judgment,' as provided in said section."

This distinction was also recognized by inference in State ex rel. Ward v. Board of Supervisors of Elections, Parish of Rapides, 186 La. 949, 173 So. 726.

We must concede that in the more recent case of State ex rel. Graham et al. v. Republican State Central Committee, 193 La. 863, 192 So. 374, the Supreme Court applied to a mandamus proceeding certain provisions of the primary election law then in force and that those portions were applicable to election contests. But, if it be felt that, in so doing, the court intended to overrule the earlier Elston case and to hold that the provisions of the Primary Election Law concerning election contests should be applicable to mandamus proceedings also, it should be remembered that in the Primary Election Law then in force there was no special section concerning mandamus or injunction proceedings and that, therefore, provisions concerning election contests might well have been said to be applicable to such mandamus or injunction suits.

But the present election law, Act No. 46 of 1940, which, in section 86, deals with election contests, contains, also, another section—No. 101—not contained in the former law (Act No. 97 of 1922)—which section provides for such injunction and mandamus proceedings, and it is especially to be noted that, although sec-

tion 86, dealing with election contests, requires that "the appellate court shall decide the same within twenty-four hours after submission", the only requirement of section 101 involving injunction and mandamus proceedings is that " * * * all proceedings taken to enforce the provisions of this Act shall be summary and same shall be tried by preference and before all or any other proceedings". Surely there is a vast distinction between the requirement that an "election contest" must, on appeal, be decided within twenty-four hours, and the requirement that a mandamus or an injunction proceeding must be tried summarily and by preference.

Our second reason for not rendering our decree within twenty-four hours after submission is our view that, even if, in a mandamus proceeding growing out of a primary election, there could be said to be a statutory requirement that the decree should be rendered within twenty-four hours, there is nothing in any way resembling such a provision in the present general election law, Act No. 224 of 1940, nor was there any such provision in the statutes which previously controlled general elections. See Act No. 130 of 1916, Dart's Louisiana General Statutes No. 2708 et seq., and Chapter 10, Title XIX, "Elections", of Dart's Louisiana General Statutes, section 2833.

In other words, although in the present Primary Election Law there is a section (No. 86) requiring that appeals in election contests be decided within twenty-four hours, neither in the present general election laws, nor in the previous general election laws, is there such a requirement. So that, even if the proceeding can be characterized as an "election contest", it is only in primary election contests that such a speedy decision is required.

There is, it is, true, a provision in the General Election Law reading as follows: "That should there be any conflict between any of the provisions of this Act and any of the provisions of the Primary Election Law, passed at this session of the Legislature, or heretofore passed, the provisions of the Primary Election Law shall govern, the repealing clause of this law to the contrary notwithstanding." Section 80.

But we do not see that it can be said that there is any conflict between the General Election Law and the Primary Election Law resulting from the fact that the former does not require an immediate decision, whereas the latter does. The difference results from a realization on the part of the legislators that there exists no paramount necessity for an immediate decision of a general election contest, whereas there is such necessity in the case of a primary election controversy, because it is necessary to print on the general election ballots the name of the person successful in the primary election litigation.

It may be noted that counsel themselves have not required the Clerk of the District Court to treat this case as one governed by the special speed provisions of section 86 (f) of the Primary Election Law since it is evident that they did not require the said clerk to notify the clerk of this court immediately upon perfection of the appeal and even before the transcript was filed, which is required by that section of the Primary Election Law upon which they seem to rely.

The judgment is annulled and the demand of the relatrix is rejected, and her suit is dismissed at her cost.

Reversed.